UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHAD BRANDON**,<br><br>        Plaintiff,<br><br>v.<br><br>**OUTPOST 24, Inc.**, *et al.*,<br><br>        Defendants. | No. 25-cv-1188 (TSC) |

## MEMORANDUM OPINION

Plaintiff Chad Brandon brings claims under the D.C. Human Rights Act against his former employer Outpost 24, Inc., and his former supervisor Paul Rowe. *See* Compl. ¶¶ 1–5, 48–110, ECF No. 1-1. Defendants now move to dismiss. *See* Defs.' Mot. to Dismiss, ECF No. 4 ("MTD"). Because Brandon has failed to state any claims, the court will GRANT the Motion.

### I.   BACKGROUND

Outpost 24, Inc., is a company incorporated in Delaware with its principal place of business in Philadelphia, Pennsylvania. Compl. ¶ 2; *see also* Decl. of Johan Ogren ¶ 3, ECF No. 7. Chad Brandon, a Black man, joined Outpost in April 2023 as an Account Executive with the North America sales team. Compl. ¶¶ 15–16. Outpost allowed Brandon to work fully remote from his home in the District of Columbia, though Brandon occasionally traveled to Philadelphia for company events. *Id.* ¶¶ 3, 8, 19, 26. Brandon reported directly to Paul Rowe, Outpost's Senior Vice President of North American Sales. *Id.* ¶¶ 4, 16. Rowe is a White man and a citizen and resident of Pennsylvania who works full time from Outpost's Philadelphia office. Decl. of Paul Rowe ¶¶ 1, 4, ECF No. 7; *see also* Compl. ¶¶ 4, 16.

On November 16, 2023, Brandon attended a company-sponsored outing at Misconduct Tavern in Philadelphia. Compl. ¶¶ 19, 21. During the event, Brandon told Mark Woodward, a White salesman, that he was a Baltimore Ravens fan. *See id.* ¶¶ 19, 23. Brandon is "a relatively new fan of the team" and Woodward became "upset" when "Brandon did not remember accurately" "some trivial Raven's history." *Id.* ¶ 23. "[A]fter learning that [] Brandon was not a 'die hard' Baltimore Ravens fan," Woodward, who was drunk, "beat[] his fist on [] Brandon's chest," repeatedly yelled "[f]uck you," and called Brandon a "bitch" in front of Rowe and other team members. *Id.* ¶ 19. Woodward—who apparently took the name of the venue to heart—yelled and screamed so loudly he attracted the attention of the bartenders. *Id.* ¶ 21. Shortly after the incident, Rowe told Brandon, "[i]f I were you, I would have told him to step outside" to fight. *Id.* ¶ 22.

"A few times after" the November event, "Woodward called [] Brandon a 'pathological liar' because of the discussion about NFL football teams." Compl. ¶ 23. Brandon complained to Rowe about Woodward's conduct. *Id.* ¶ 25. Then, in January 2024, Rowe reassigned a deal from Brandon to Woodward without explanation. *Id.* When Brandon later complained to Rowe about the deal being reassigned, "Rowe brought up the fact . . . that [] Brandon had only closed 'a handful' of deals . . . up to that point." *Id.* ¶ 37.

On March 19, 2024, Brandon, Woodward, and Rowe attended another company-sponsored event, again at Misconduct Tavern. Compl. ¶¶ 26–27. During this second event, Rowe "joked about how 'wasted' . . . Woodward had been at the previous" outing. *Id.* ¶ 26. Woodward, again drunk, flipped a middle finger at Brandon. *Id.* ¶ 27. Brandon told Woodward that his behavior was disrespectful, and that it was unacceptable for Woodward to treat Brandon "in this manner, especially in front of [Rowe] and their team." *Id.* ¶ 29. "Woodward became defensive," appeared

ready to leap from his chair, accused Brandon of "just being sensitive," and "laughed at [] Brandon's obvious frustration." *Id.* ¶¶ 30, 32. "Rowe attempted to intervene by telling [] Woodward, '[Brandon] is just trying to tell you how he feels,'" but Woodward "was not hearing it." *Id.* ¶ 30.

On March 20, Rowe emailed Brandon, "I think it's important for us to connect before Friday just so I can understand what the issue is with you and [Woodward]." Defs.' Ex. 4 at 2, ECF No. 7. Brandon wrote back, "I can take a joke just as good as anybody else, but [Woodward is] OBVIOUSLY crossing the line. This is the second time he got drunk and disrespected me in front of you and our teammates. . . . He's called me a bitch to my face. He said fuck you way too many times at this point. And then has the audacity to give me the middle finger right in front of you and everyone." *Id.* at 1. Brandon did not indicate in his email that he thought Woodward's behavior was racially charged or motivated. *See id.*

On March 21, Brandon spoke by phone with Rowe and asked Rowe how "to file a formal complaint with HR." Compl. ¶ 33. Five days later, Brandon emailed his formal complaint to Gudrun Gudmundsdottir, Outpost's head of HR. *Id.* ¶ 34; *see* also Defs.' Ex. 5 at 1, ECF No. 7. In it, Brandon described "two separate occurrences" involving Woodward. Defs.' Ex. 5 at 1. In the first occurrence, Woodward began cursing at him "after learning I was not a 'die-hard' Baltimore Ravens fan." *Id.* Brandon conceded that "although I can admit [Woodward] wasn't trying to punch me or really hurt me," Woodward did "put his hands on me." *Id.* Brandon noted that Woodward "called me a 'pathological liar' a few times because of the discussion about NFL football teams." *Id.* Brandon also described the second incident involving the middle finger. *Id.* Nowhere in his formal complaint to HR did Brandon mention race or discrimination or otherwise indicate that Woodward's conduct towards him was racially motivated. *See id.*

"Almost immediately after" Brandon "filed his complaint with HR, [] Rowe's demeanor and attitude toward [] Brandon changed." Compl. ¶ 35. Ten days after reaching out to HR, Brandon had not heard back, so he emailed Gudmundsdottir asking for an update. *Id.* ¶ 39. Gudmundsdottir replied that she had "not yet been able to review" Brandon's complaint and that she would "hopefully be in touch next week." *Id.* ¶ 40. Four days later, on April 9, Rowe called Brandon and informed him that he was being let go. *Id.* ¶¶ 42, 44. Rowe told Brandon that he "was 'the most expensive guy on the team' and his termination was for cost cutting reasons," not "performance." *Id.* ¶¶ 43–44.

In March 2025, Brandon filed this lawsuit in D.C. Superior Court asserting four claims under the D.C. Human Rights Act. Count One alleges that Outpost created a hostile work environment against Brandon because of his race, including by failing to address Woodward's behavior and by "failing to even review [] Brandon's official complaint" within ten days after he filed it. Compl. ¶¶ 51–52. Count Two claims that Rowe aided and abetted this hostile work environment. *Id.* ¶¶ 62–63. Count Three asserts that Outpost retaliated against Brandon each of the three times he complained about Woodward's harassing conduct, specifically when (1) Rowe took a deal away from Brandon in January 2024, (2) Rowe changed his demeanor towards Brandon after they spoke in March, and (3) Rowe fired Brandon after he filed a formal complaint with HR. *Id.* ¶¶ 74–81. Count Four alleges that Rowe aided and abetted the retaliation. *Id.* ¶¶ 93–95. Brandon seeks $2 million in damages. *See* Notice of Removal – Ex. A at 1, ECF No. 1-1.

In April 2025, Defendants removed the case to this court under 28 U.S.C. § 1441(b). *See* Notice of Removal, ECF No. 1. The court has jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in

controversy exceeds $75,000. Defendants now move to dismiss. *See* MTD; *see also* Defs.' Mem. Supp. MTD, ECF No. 5 ("Defs.' Br.").

## II. LEGAL STANDARDS

When confronted with a claim under the D.C. Human Rights Act ("DCHRA"), this court applies federal procedural law and D.C. substantive law. *See Novak v. Cap. Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006); *see also Burke v. Air Serv. Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

In deciding a Rule 12(b)(6) motion, the court may consider factual allegations in the complaint, as well as documents attached to or "incorporated by reference" in the complaint, "even if the document is produced . . . by the defendant in a motion to dismiss." *Cordoba Initiative Corp. v. Deak*, 900 F. Supp. 2d 42, 46 n.5 (D.D.C. 2012) (cleaned up). Considering "document[s] that [the] complaint specifically references"—including Brandon's emails to Rowe and Gudmundsdottir—does not "convert[] the motion into one for summary judgment." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015).[1] When an allegation in the complaint "conflict[s] with any exhibits or documents . . . adopted by reference, the exhibits or documents prevail." *Alston v. District of Columbia*, 772 F. Supp. 3d 43, 55 (D.D.C. 2025) (quoting *Davis v. World Savings Bank*, 806 F. Supp. 2d 159, 172 (D.D.C. 2011)).

---

[1] Plaintiff does not dispute that the emails provided by Defendants are authentic, nor does he contest that his Complaint incorporated these emails by reference. *See generally* Pl.'s Opp'n to MTD, ECF No. 10.

When applying D.C. substantive law, this court must seek to "achieve the same outcome" that the D.C. Court of Appeals would reach if it were to decide the case. *Novak*, 452 F.3d at 907. Notably, in deciding cases under the DCHRA, the D.C. Court of Appeals "consistently relies upon decisions of the federal courts in Title VII cases as particularly persuasive authority" given the substantial overlap between the two statutes. *Daka, Inc. v. Breiner*, 711 A.2d 86, 94 (D.C. 1998); *see also Propp v. Counterpart Int'l*, 39 A.3d 856, 864 n.11 (D.C. 2012). Consequently, the court draws from both D.C. Court of Appeals and D.C. Circuit case law.

### III.   ANALYSIS

#### A. Subject-Matter Jurisdiction

Defendants first move to dismiss for lack of subject-matter jurisdiction. They contend that this court lacks jurisdiction because the DCHRA does not extend to the alleged discrimination at issue here, which occurred in Pennsylvania. *See* Defs.' Br. at 16–20. Before deciding any other issue, this court must assure itself of subject-matter jurisdiction; it may not assume hypothetical jurisdiction for the purpose of dismissing on some other ground. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

But as another court in this district has explained, "although Defendants [and some courts] nominally frame their [analysis] in terms of the subject-matter jurisdiction of this court, the thrust of [their] argument really goes to the territorial reach of the DCHRA as it relates to the facts alleged in this case . . . not [to] subject-matter jurisdiction." *Tolton v. Jones Day*, No. 19-cv-945, 2020 WL 2542129, at *35 (D.D.C. May 19, 2020). Indeed, "to ask what conduct [the DCHRA] reaches is to ask what conduct [the DCHRA] prohibits, which is a merits question." *Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 254 (2010); *see also United States ex rel. Hawkins v. ManTech Int'l*

*Corp.*, 752 F. Supp. 3d 118, 122 (D.D.C. 2024) (explaining that whether a statute covers the conduct at issue "is a merits question, not a matter that goes to subject matter jurisdiction"). "Subject-matter jurisdiction, by contrast, 'refers to a tribunal's power to hear a case.'" *Morrison*, 561 U.S. at 254 (quoting *Union Pac. R.R. Co. v. Locomotive Eng'rs*, 558 U.S. 67, 81 (2009)). Because the close merits question of whether the DCHRA reaches the conduct alleged here is not jurisdictional, the court needs not resolve it. Even if the DCHRA extended to Defendants' Pennsylvania-based behavior, Brandon has otherwise failed to adequately allege either a hostile work environment or retaliation in response to protected activity.

### B. Hostile Work Environment

"To assert a hostile work environment claim under the [DCHRA], . . . an employee must plausibly allege that [he] was subjected to 'severe or pervasive' harassment based on [his] membership in a protected class." *Sonmez v. WP Co.*, 330 A.3d 285, 324–25 (D.C. 2025) (citation omitted). Brandon's claim fails for two reasons. First, he alleges nothing in the Complaint to support a plausible inference that he was subjected to hostility because of his race. *See Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 534 (D.C. Cir. 2025). Second, the conduct that Brandon complains of was neither severe nor pervasive. *See Sonmez*, 330 A.3d at 325.

#### a. Discrimination Because of Race

To start, Brandon's own allegations advance an "'obvious alternative explanation'" for Woodward's alleged behavior which indicates "that discrimination is not a plausible inference." *Joyner*, 140 F.4th at 534 (quoting *Ho v. Garland*, 106 F.4th 47, 54 (D.C. Cir. 2024))[2]; *see also*

---

[2] Although *Joyner* analyzes several claims under Section 1981 as well as Title VII, the D.C. Circuit "'use[s] the same framework for determining whether unlawful discrimination has occurred' under both statutes." *Joyner*, 140 F.4th at 534 (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013)).

*Morris v. District of Columbia*, 313 A.3d 545, 551 (D.C. 2024) (emphasizing that the allegations "suggest that, aside from [plaintiff's] membership in a protected class, there is a non-discriminatory, alternative explanation" for the conduct complained of). Specifically, the Complaint alleges that Woodward's boorish conduct began only "*after* [Woodward] learn[ed] that [] Brandon was not a 'die hard' Baltimore Ravens fan." Compl. ¶ 19 (emphasis added). The Complaint states that a drunken Woodward became "upset" when "Brandon did not remember accurately" "some trivial Raven's history." *Id.* ¶ 23. The Complaint further alleges that Woodward "called [] Brandon a 'pathological liar' *because of the discussion about NFL football teams*." *Id.* (emphasis added). Brandon's email to HR offers this same nondiscriminatory explanation. *See* Defs.' Ex. 5 ("His words began after learning I was not a 'die-hard' Baltimore Ravens fan."); *see also id.* ("He's called me a 'pathological liar' a few times *because of the discussion about NFL football teams*." (emphasis added)). And nowhere in either his email to HR or to Rowe did Brandon indicate that Woodward's behavior was motivated by race. *See generally* Defs.' Exs. 4 & 5. Accordingly, Brandon's "own pleadings raise—and then offer nothing to rebut" an "obvious alternative explanation" for Woodward's conduct: a drunk co-worker overzealous about football. *Joyner*, 140 F.4th at 534.

Notably, Brandon does not allege that Woodward used any racial slurs or racially charged language at any time. Although such direct evidence of animus is not necessary, without it, Brandon must at least allege circumstantial evidence of discrimination, such as evidence that "he 'was treated differently from similarly situated employees' outside his protected class." *Joyner*, 140 F.4th at 529 (quoting *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014)). Brandon attempts to make this showing—he vaguely asserts that "Woodward did not treat his other colleagues (who were not African-American/Black) in the same manner." Compl. ¶¶ 20, 24, 28.

But it is not "enough to simply allege that the plaintiff was treated differently from a 'similarly situated' comparator, without additional allegations showing the comparators are in fact 'similarly situated' in some meaningful respect." *Joyner*, 140 F.4th at 531. Such an allegation amounts to "a 'threadbare recital' of a 'legal conclusion,' 'devoid of further factual enhancement.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Brandon's conclusory allegation is exactly that. He "plead[s] essentially no facts at all to show that his identified comparators were similarly situated to him in relevant respects" vis-à-vis Woodward. *Joyner*, 140 F.4th at 533; *see also Morris*, 313 A.3d at 551 ("Beyond the mere conclusory statement that her 'male and U.S.-born colleagues were not subjected to the same actions' . . . Ms. Morris failed to allege in her complaint that these colleagues . . . were similarly situated to her."). Brandon has not alleged, for example, that Woodward reacted with less hostility when he had a similar disagreement with a non-Black colleague. "[W]hen 'the only information' a plaintiff provides is that an 'ambiguous' 'co-worker' of a different race was treated differently in some way, he 'has failed to state a claim for disparate treatment discrimination.'" *Hicks v. D.C. Water & Sewer Auth.*, No. 24-cv-2288, 2025 WL 2439161, at *3 (D.D.C. Aug. 25, 2025) (quoting *Budik v. Howard Univ. Hosp.*, 986 F. Supp. 2d 1, 7 (D.D.C. 2013)).

**b. Severe or Pervasive Harassment**

Brandon's claim also fails because he has not adequately alleged that Woodward's conduct transformed his workplace into a hostile work environment. The DCHRA is not a "general civility code[]" for policing "the ordinary tribulations of the workplace." *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 120 (D.D.C. 2015) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The requirement of "severe or pervasive" harassment is "meant to be 'demanding.'" *Sonmez*, 330 A.3d at 325 (quoting *Faragher*, 524 U.S. at 788). "The series of acts

giving rise to the alleged hostile environment must be of such severity or pervasiveness as to 'alter the conditions of the victim's employment and create an abusive working environment,' to the degree that the workplace is 'permeated with discriminatory intimidation, ridicule, and/or insult,' or is otherwise transformed into a comparable toxic, discriminatory milieu on a day-to-day basis." *Id.* (quoting *D.C. Dep't of Pub. Works v. D.C. Off. of Hum. Rts.*, 195 A.3d 483, 495 (D.C. 2018)). Although a "single" extreme incident, such as the use of an egregious racial epithet by a supervisor, "may be severe enough," a plaintiff must usually point to "more than a few isolated incidents" of hostile conduct. *D.C. Dep't of Pub. Works*, 195 A.3d at 495–96 (quoting *Smith v. D.C. Off. of Hum. Rts.*, 77 A.3d 980, 997 (D.C. 2013)); *see also Sonmez*, 330 A.3d at 325 ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment." (quoting *Faragher*, 524 U.S. at 788)). Moreover, a plaintiff must demonstrate not only that he felt the environment was abusive, but that it "objectively" was. *Sonmez*, 330 A.3d at 325.

Brandon's allegations, accepted as true, fall short of this "demanding" standard. *Sonmez*, 330 A.3d at 325 (quoting *Faragher*, 524 U.S. at 788). Although Woodward's alleged behavior was decidedly boorish, it amounts to what Brandon described as "two separate occurrences" four months apart, Defs.' Ex. 5 at 1, interspersed with a "few" instances of Woodward calling Brandon a "pathological liar." Compl. ¶¶ 19, 23, 27. That sort of "sporadic use of abusive language" by a single co-worker is insufficient to "transform[]" the workplace into "an abusive working environment . . . on a day-to-day basis." *Sonmez*, 330 A.3d at 325 (cleaned up). That is especially so here because Brandon worked fully remote and was not exposed to Woodward on a regular basis. *Cf. Hathaway v. Runyon*, 132 F.3d 1214, 1223 (8th Cir. 1997) (explaining that an assigning an employee to work in close proximity to harassers is a significant factor in the hostile work environment inquiry, though not a *per se* requirement). And notably, Brandon does not allege that

Woodward used any racial slurs or otherwise racially charged language, much less the sort of extreme racist language that could render more infrequent harassment sufficiently severe. *See D.C. Dep't of Pub. Works*, 195 A.3d at 495–96.

To be sure, Woodward's physical aggression makes his conduct more severe. *See Sonmez*, 330 A.3d at 325 (asking whether the conduct was "physically threatening"). But Brandon conceded in his HR complaint that Woodward "wasn't trying to punch me or really hurt me," precluding an inference that Woodward was truly threatening. Defs.' Ex. 5. Thus, notwithstanding his aggressive behavior, Woodward's conduct still only amounts to isolated incidents of mostly verbal, non-racial harassment. *See Brooks v. Grundmann*, 748 F.3d 1273, 1275, 1277 (D.C. Cir. 2014) (meeting where supervisor "yelled" at plaintiff, slammed his hand on the table, and "violently threw a book" in plaintiff's direction was "at its worst . . . an isolated" incident).

It matters, too, that all the alleged abuse came from a single co-worker, not Brandon's supervisor. *See McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 408 (4th Cir. 2022) ("The status of the harasser is also a 'significant factor' to be considered; harassment by a supervisor tends to be more serious, while harassment by a co-equal is less serious." (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (en banc))). Woodward's lack of authority over Brandon and lack of status in the workplace mean his harassing conduct had less ability to humiliate Brandon or alter his working conditions. *See id.* Although Rowe and Gudmundsdottir allegedly failed to address Woodward's conduct, neither endorsed it. To the contrary, Rowe made fun of Woodward for his drunkenness, and "attempted to intervene" when Woodward dismissed

Brandon's grievances "by telling [] Woodward, '[Brandon] is just trying to tell you how he feels.'" Compl. ¶¶ 26, 30.[3]

Simply put, Brandon's allegations are not "extreme" enough to establish a hostile workplace "permeated with discriminatory intimidation, ridicule, and/or insult." *Sonmez*, 330 A.3d at 325. Compare Brandon's allegations to *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008). There, a supervisor repeatedly reprimanded the plaintiff, gave him a bad performance review, sought to suspend him, and verbally abused him on several occasions, including by allegedly threatening to have him "arrested, led out of the building in handcuffs, and jailed." *Id.* at 1195. The D.C. Circuit held that these "disciplinary actions" and verbal altercations *by a supervisor* "were not so 'severe' or 'pervasive' as to have changed the conditions of [plaintiff's] employment." *Id.* at 1201. Here, Brandon alleges only isolated altercations with a co-worker, and no threats of serious disciplinary actions like suspension.

Brandon's allegations fare no better when compared to *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005). There, the plaintiff was told on three separate occasions by separate co-workers to "go back to Trinidad" or "go back to where [you] came from." *Id.* at 408. "On these and other occasions," co-workers "shouted at" the plaintiff, told her "that she should never have been hired," and told her to "shut up." *Id.* The D.C. Circuit held that those racially charged insults by multiple co-workers were "exactly the sort of 'isolated incidents' that . . . cannot form the basis" of a hostile

---

[3] To the extent Brandon suggests that Rowe's decision to reassign a single sale from Brandon to Woodward in January 2024 was connected to Brandon's complaint about Woodward's conduct and formed part of the hostile work environment, that assertion is not plausible. *See Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015) ("The constituent acts must be adequately linked such that they form a coherent hostile environment claim." (cleaned up)). Brandon's suggestion is undercut by his own allegation that Rowe's demeanor toward him only shifted in late March 2024, and the fact that Rowe offered a facially legitimate reason for reassigning the sale which Brandon does not dispute the truth of—specifically "that [] Brandon had only closed 'a handful' of deals . . . up to that point." Compl. ¶¶ 35, 37.

work environment claim. *Id.* at 417. Here, Brandon alleges similarly infrequent harassment by a single co-worker who did not use any racially charged language. Although Woodward's alleged behavior was undoubtedly obnoxious and unprofessional, it does not rise to the level of a hostile work environment.

### C. Retaliation

To plead a retaliation claim under the DCHRA, a plaintiff must allege, among other things, that "she engaged in protected activity by opposing or complaining about employment practices that are unlawful under the Act." *Sonmez*, 330 A.3d at 328. To satisfy this requirement, the plaintiff must have "'clearly voice[d] her opposition' to illegal discrimination." *Vogel v. D.C. Off. of Planning*, 944 A.2d 456, 465 (D.C. 2008) (quoting *Howard Univ. v. Green*, 652 A.2d 41, 48 (D.C. 1994)). "It is not enough . . . to object to . . . mistreatment in general"; the plaintiff must "connect[] [the mistreatment] to membership in a protected class." *Sonmez*, 330 A.3d at 328. "Employer awareness that the employee is engaged in protected activity . . . is essential." *Vogel*, 944 A.2d at 464 (quoting *Green*, 652 A.2d at 46). Thus, "a vague charge of discrimination will not support a subsequent retaliation claim." *Sonmez*, 330 A.3d at 328 (quoting *Vogel*, 944 A.2d at 465). Even the "use of words like 'bias,' 'prejudice,' and 'hostile work environment'" are insufficient to put the employer on notice that the plaintiff is complaining of illegal discrimination "if untethered to the allegation that the conduct occurred because of membership in a protected class." *Id.* (cleaned up).

Brandon alleges that he engaged in protected activity by (1) complaining to Rowe about Woodward's conduct sometime after the November event, (2) emailing a complaint to Rowe in March, and (3) submitting a formal complaint to HR that same month. Compl. ¶¶ 25, 31, 34. But he fails to adequately allege that any of these complaints put his employer on notice that he was

complaining of discrimination *based on race*. True, Brandon states in conclusory terms that he reported Woodward's "discriminatory" behavior. *See, e.g.*, Compl. ¶ 34 ("In the written complaint, [] Brandon reported [] Woodward's verbally abusive, discriminatory, and harassing conduct[.]"). But Brandon does not allege that he described Woodward's behavior as discriminatory to management, nor does he assert that his complaints mentioned his membership in a protected class, connected the mistreatment he experienced to that membership, or otherwise described Woodward's conduct as discrimination on the basis of a protected characteristic. *See Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235, 247 (D.D.C. 2011) (dismissing plaintiff's retaliation claim because he failed to link his supervisor's harassment to his protected characteristic in his complaints to his employer). Brandon's emails to Rowe and Gudmundsdottir likewise do not mention "discrimination" by Woodward, nor do they describe mistreatment motivated by race, only mistreatment motivated by a quarrel over Baltimore Ravens trivia. Brandon therefore "did not say enough to alert [his] employer that [he] was objecting to discrimination *based on a protected characteristic*." *Sonmez*, 330 A.3d at 329 (emphasis added).

## IV.    CONCLUSION

Because Brandon failed to state predicate claims of a hostile work environment or retaliation, his aiding-and-abetting claims against Rowe necessarily fail. The court will therefore GRANT Defendants' Motion to Dismiss. A separate order will follow.

Date: February 10, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge